# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

THOMAS EUGENE HOLDEN, #457855,

        Petitioner,

v.                                               Case No. 14-13701

THOMAS MACKIE,

        Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Thomas Eugene Holden seeks the writ of habeas corpus under 28 U.S.C. § 2254. He challenges his Michigan convictions for assault with intent to commit murder, Mich. Comp. Laws § 750.83, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b. Holden argues in an amended brief filed on February 13, 2017 (ECF No. 16) iterations of the following claims : (1) he was deprived of a fair trial by the use of "other acts" evidence and the prosecutor's closing argument; (2) the trial court relied on inaccurate information at his sentencing and mis-scored the Michigan sentencing guidelines; and (3) he was deprived of effective assistance of trial and appellate counsel. In its response to the petition, the State argues that Holden's claims are procedurally defaulted, not cognizable on habeas review, barred by the statute of limitations, or meritless and were reasonably rejected by the state courts. (ECF Nos. 10, 19.) For the reasons explained below, the court agrees with the State

that Holden is not entitled to habeas corpus relief. Accordingly, the petition, as amended, will be denied.

# I. BACKGROUND

Holden was initially charged with assault with intent to commit murder, assault with a dangerous weapon, felon in possession of a firearm, and felony-firearm, second offense. The charges arose from an altercation between Holden and his stepfather, Dwight McCree ("Dwight"), in Detroit, Michigan on April 13, 2011. Holden was tried in Wayne County Circuit Court. The Michigan Court of Appeals accurately summarized the evidence at trial as follows:

> Jerrell McCree testified that, on April 13, 2011, he was waiting for a ride outside of his father's house when defendant, his half-brother, approached him "ready to fight." After Jerrell stepped back, defendant threatened him saying, "When I catch you I'm beating your ass." Jerrell then went back into the house and his father, Dwight McCree, walked outside and exchanged words with defendant, Dwight's step-son. About ten minutes later, there was a knock on the door and Dwight walked to the door. Jerrell then heard about six shots fired outside the house. Next, he saw Dwight on the floor. Dwight said that he was hit on his shoulder and was bleeding. Jerrell testified that less than a week before this incident, he was driving defendant somewhere when a "heated argument" occurred and defendant "swung on me," hitting Jerrell in the face. Jerrell got out of the vehicle and ran to a gas station. Defendant chased him driving the vehicle. At the gas station, defendant got out of the vehicle, approached Jerrell, struck him, and then tried to drag him out of the gas station. Jerrell "pulled back and that was it." Jerrell had not seen defendant again until the day of this shooting.
>
> Dwight testified that, on April 13, 2011, he was home when Jerrell came into the house and looked upset. Dwight looked out the front door and saw defendant. Defendant told Dwight he "was on my last leg and then he said he had one of those too." Dwight believed that defendant was referring to the fact that Dwight was "getting old" and that defendant also had a gun. Dwight had a gun in the house and defendant knew where the gun was located. Defendant told Dwight that he would be right back and left in his car. About ten minutes later, Dwight heard shots being fired outside and a window in his house breaking. Dwight got his shotgun, ran to the front of the house, and began opening the front door. While he was opening the

door, he then heard another shot, which penetrated the door and caused the door to open.

After the door opened, Dwight saw defendant on the front porch and he was holding a gun in his right hand. No one else was seen. Dwight fired a shot through the closed screen door hoping to scare defendant away. Dwight then moved to the right side of the door, and two more shots were fired into Dwight's house through a window on the side of the door where Dwight was standing. Those two shots struck Dwight in his upper right shoulder. He slid down the wall and then looked out the window and saw defendant drive off in his car. Dwight identified defendant as the shooter to the police. Dwight testified that he had had problems "off and on" with defendant; it was a "bad relationship." Detroit Police Officer Donald Covington testified that he responded to a shooting and arrived at the house to find bullet holes in the front door and window of the house, as well as a victim who had been shot in the shoulder. The victim was Dwight and he identified defendant as the shooter.

*People v. Holden*, No. 308164, 2013 WL 1165220, at *1 (Mich. Ct. App. Mar. 21, 2013).

At trial, Holden did not testify or present any witnesses, and the parties stipulated, for purposes of the felon-in-possession count, that Holden had a prior felony conviction and was ineligible to possess a gun on the day in question. Holden's defense was that he was not the shooter and was not present during the shooting. In the alternative, Holden argues that even if the jury believed the witnesses' testimony, he had no intent to kill or wound anyone.

The trial court merged the two assault counts in its charge to the jury and instructed the jurors that they could find Holden not guilty, guilty as charged of assault with intent to commit murder, or guilty of one of two lesser offenses: assault with intent to do great bodily harm less than murder or assault with a dangerous weapon. The court also instructed the jurors that they could find Holden "not guilty" or "guilty" of the two firearm charges.

On December 9, 2011, the jury found Holden guilty of assault with intent to commit murder, felon in possession of a firearm, and felony-firearm. On December 22, 2011, the trial court sentenced Holden as a habitual offender to a term of 20 to 30 years in prison for the assault conviction, 10 to 20 years for the felon-in-possession conviction, and 5 years for the felony-firearm conviction.

Holden appealed to the Michigan Court of Appeals, arguing through counsel that: (1) the trial court deprived him of his right to a fair trial by admitting irrelevant evidence of an unrelated assault, and the prosecutor exacerbated the error during closing arguments; and (2) the trial court mis-scored offense variable six of the Michigan sentencing guidelines. The Michigan Court of Appeals rejected Holden's claims and affirmed his convictions and sentence in an unpublished, *per curiam* decision. *See Holden*, 2013 WL 1165220 (Mich Ct. App. 2013). On July 30, 2013, the Michigan Supreme Court denied Holden leave to appeal because it was not persuaded to review the issues. *See People v. Holden*, 834 N.W.2d 494 (Mich. 2013).

On September 23, 2014, Holden filed his habeas corpus petition, which raised the same two claims that he presented to the state court on direct review. After the State filed an answer to the petition, Holden moved for a stay of the federal proceeding while he pursued additional state remedies for new claims regarding his trial and appellate attorneys. (ECF No. 12.) The court granted Holden's motion to stay and closed this case for administrative purposes. (ECF No. 14.)

Holden then filed a *pro se* motion for relief from judgment in the state trial court, arguing that his trial and appellate attorneys were ineffective. The state trial court found

no merit in Holden's claims about trial counsel and denied his motion because he failed to raise his claims on appeal. *See People v. Holden*, No. 11-8368-01 (Wayne Cty. Cir. Ct. Mar. 25, 2015) (unpublished). Holden appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal because Holden failed to establish that the trial court erred in denying his motion for relief from judgment. *See People v. Holden*, No. 332824 (Mich. Ct. App. July 6, 2016) (unpublished). On January 31, 2017, the Michigan Supreme Court denied leave to appeal because Holden failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Holden*, 889 N.W.2d 265 (Mich. 2017).

Holden then filed a motion to re-open this case and an amended brief in support of his habeas claims. (ECF No. 16.) The amended brief raises the claims that Holden presented to the state court on direct review and on state collateral review. The court granted Holden's motion and re-opened this case. (ECF No. 17.) The amended petition has been fully briefed.

## II.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that [state-court decisions] be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotations omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Thus, "[o]nly an 'objectively unreasonable' mistake, one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir. 2019) (quoting *Richter*, 562 U.S. at 103) (internal citation omitted). A state-court's factual determinations, moreover, are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.  ANALYSIS

### A.  "Other Acts" Evidence

In his first claim, Holden alleges that the trial court deprived him of a fair trial by admitting irrelevant and unfairly prejudicial evidence of an unrelated assault. The disputed evidence consisted of Jerrell McCree's testimony that, about a week before Holden's assault on Dwight, Holden asked Jerrell to drive him somewhere, and when Jerrell apparently did not take the route that Holden wanted him to take, Holden swung at Jerrell and hit him on the face. Jerrell then exited the vehicle and ran to the nearest gas station. Holden followed Jerrell in the vehicle, got out of the car at the gas station, and hit Jerrell again. The altercation ended after Holden dragged Jerrell out of the gas station. (ECF No. 11-5, PageID.261–63.)

Holden argues in his habeas petition that this evidence was improperly admitted at his trial because it had no relationship to the incident for which he was on trial and because the evidence neither proved, nor disproved, the two main issues: the identity of the shooter and the shooter's intent. Holden also alleges that the prosecutor violated the Michigan Rules of Evidence by failing to (1) give proper notice of her intent to use the evidence and (2) offer a non-propensity rationale for the evidence. Holden further alleges that the prosecutor exacerbated the error during closing arguments by using the "other acts" evidence to argue that Holden was a violent individual. Finally, Holden argues that the cumulative effect of the errors deprived him of his constitutional right to a fair trial.

The Michigan Court of Appeals reviewed Holden's claim for "plain error" because he objected at trial on the basis of relevance, but on appeal, he argued for the first time that the evidence was inadmissible under Michigan Rule of Evidence 404(b). The Court of Appeals analyzed Holden's claim and concluded that the disputed evidence was admissible under either Michigan Rule of Evidence 404(b) or under the *res gestae* exception to Rule 404(b). The Court of Appeals also rejected Holden's argument that the prosecutor's failure to give notice of her intent to use the evidence was reversible error. Finally, the Court of Appeals stated that, although the prosecutor's closing argument about Holden being a violent individual was improper, the error was harmless.

The State argues that the first part of Holden's claim is procedurally defaulted because Holden failed to make a proper objection at trial. In the habeas context, a procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Under the related doctrine, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

A procedural default, however, is not a jurisdictional bar to review of the merits of a claim, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Because Holden's claim regarding the admission of "other acts" evidence and the prosecutor's closing argument does not warrant habeas

relief, the court bypasses the procedural-default analysis and directly proceeds to the merits of Holden's first claim.

### 1. Jerrell's Testimony Regarding his Prior Altercation with Holden

Holden's claim that the admission of "other acts" evidence violated the Michigan Rules of Evidence is not cognizable on federal habeas review. *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009) ("To the extent that any testimony and comments violated Michigan's rules of evidence, such errors are not cognizable on federal habeas review."). Furthermore, Holden's claim is not cognizable on habeas review because "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, the state courts' rulings on the "other acts" evidence were not "contrary to" any Supreme Court decision under AEDPA. *Id.*

Of course, "[i]f a ruling is especially egregious and 'results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief.'" *Wilson v. Sheldon*, 874 F.3d 470, 475 (6th Cir. 2017) (citations omitted). But "states have wide latitude with regard to evidentiary matters under the Due Process Clause," and state-court evidentiary rulings do not rise to the level of a due process violation unless they offend a fundamental principle of justice. *Id.* at 475–76.

In the present case, the disputed evidence was admitted for a proper purpose. In the words of the Michigan Court of Appeals,

> Jerrell's testimony regarding the violent nature of defendant's actions
> toward him less than a week before the shooting gave context to the

events that occurred on the day of the shooting, explaining the background circumstances of this crime. The testimony explained why, when he saw Jerrell for the first time since that altercation, defendant approached Jerrell "ready to fight." The testimony also explained why Jerrell immediately retreated and appeared upset to his father, Dwight, who then went to the front door of his house to investigate the cause. The jury could infer from this evidence that a continuing and unresolved "family feud" led to defendant firing several gunshots at his mother and stepfather's house. . . .

There was no other evidence of record which would explain why defendant, without reason or provocation, would fire several gunshots at the house. And without Jerrell's contested testimony, the jury would have been deprived "an intelligible presentation of the full context in which the disputed events took place," i.e., the "complete story."

*Holden*, 2013 WL 1165220, at *2–3.

The evidence also was relevant because Holden's "defense was that he did not commit the charged crimes," and "[i]dentity is always an essential element in a criminal case." *Id.* at *4. "The evidence tended to establish that, because of an on-going family dispute, defendant was the person who fired several gunshots at the house, two of which struck Dwight." *Id.* Finally, the evidence was not unfairly prejudicial. In the state court's words, the evidence, "was more than marginally probative and was unlikely to be given undue weight by the jury because the prior incident involved Jerrell, did not involve a gun or shooting, and the charged crimes were not committed against Jerrell." *Id.*

The court concludes that Jerrell's testimony regarding the altercation with Holden about a week before the shooting was not so fundamentally unfair as to deprive Holden of due process. Therefore, he is not entitled to relief on his claim.

## 2. The Prosecutor's Closing Argument

Holden contends that the prosecutor's closing argument regarding Jerrell's "other acts" testimony exacerbated the evidentiary error and constituted improper propensity evidence.

The Supreme Court has said that prosecutors have a duty to "refrain from improper methods calculated to produce a wrongful conviction." *Viereck v. United States*, 318 U.S. 236, 248 (1943). Prosecutorial-misconduct claims are reviewed deferentially in a habeas case. *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). When the issue is the prosecutor's remarks during closing arguments, the "clearly established Federal law" is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (*per curiam*). In *Darden*, the Supreme Court stated that:

> [I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031, 1036 (11th Cir. 1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642.

*Darden*, 477 U.S. at 181.

The prosecutor made the remarks in dispute in this case when summarizing Jerrell's testimony about his altercation with Holden at the gas station. She said:

> And what did the defendant do? I believe the witness said he got heated and he hit his brother in the face. And Jerrell McCree told you that he got out [of] the car and he began to run. And did the defendant leave it right there? No. He escalated the situation and chased his brother in the car to

the gas station. Did he leave it there? No. He escalated that situation and went inside the gas station after his brother; hit him again; the witness said he fell to the ground and then the defendant tried to drag him out of the gas station, '*cause that's the type of person the defendant is. He's a violent individual. Obviously, a family familiar (sic) relationship did not mean anything at the time.*

(ECF No. 11-5, PageID.326) (emphasis added).

No witnesses at trial testified that familial relationships meant nothing to Holden. Furthermore, the prosecutor expressed her personal opinion when she stated that Holden was a violent individual. Prosecutors should refrain from interjecting their personal beliefs into the presentation of their cases. *United States v. Young*, 470 U.S. 1, 8–9 (1985). They should also refrain from emphasizing a defendant's bad character and from relying on facts not in evidence. *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005). Nevertheless, the jury could infer from trial testimony about Holden's behavior toward family members that he was a violent individual who gave little regard for his familial relationships. Thus, the prosecutor's remarks were not so unfair as to deprive Holden of due process. *See United States v. Polizzi*, 500 F.2d 856, 899 (9th Cir. 1974) (concluding that the prosecutor's comments during closing arguments— that the defendants were violent individuals—were not so prejudicial as to require reversal of the jury's verdicts). The prosecutor for Holden's trial was permitted to "argue the record . . . and forcefully assert reasonable inferences from the evidence." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008).

The Michigan Court of Appeals, moreover, determined that the prosecutor's remarks were harmless. The Court of Appeals' decision was an objectively reasonable conclusion given the substantial amount of evidence against Holden and the fact that

the trial court sustained defense counsel's objection to the prosecutor's remarks. (ECF No. 11-5, PageID.327.) The trial court also instructed the jurors at the beginning of the trial and in its concluding charge to the jury that the attorneys' arguments were not evidence and that the jurors should only base their verdict on the admissible evidence. (*Id.* at PageID.50–51; ECF No.11-6, PageID.6–7.) Juries are presumed to follow a trial court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). A court's instruction to a jury that the attorneys' arguments are not evidence can cure improprieties in closing arguments. *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000) (quoting *United States v. Carroll*, 26 F.3d 1380, 1389 n. 12 (6th Cir. 1994)). For all the foregoing reasons, Holden is not entitled to relief on his prosecutorial-misconduct claim.

### 3.  Cumulative Effect of Errors

Holden maintains that the cumulative effect of the "other acts" evidence and the prosecutor's remarks deprived him of a fair trial. Post-AEDPA, however, this claim is not cognizable on habeas corpus review because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *see also Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

### B.  The Sentencing Guidelines

In his second claim, Holden alleges that the trial court erroneously scored fifty points for offense variable six of the Michigan sentencing guidelines. Offense variable six "is the offender's intent to kill or injure another individual." Mich. Comp. Laws §

777.36(1). A sentencing court may score fifty points for this offense variable if the offender premeditated a killing. Mich. Comp. Laws § 777.36(1)(a).

The state trial court scored fifty points for offense variable six because it thought that Holden had premeditated his crimes based on the trial court's conclusion that, prior to the shooting, Holden told Dwight, "I'm coming back to get you." (ECF No. 11-7, PageID.372.) According to Holden, the trial court's belief that Holden said, "I'm coming back to get you," is not supported by the record.

The Michigan Court of Appeals concluded on review of Holden's claim that the trial court's scoring of offense variable six was not clearly erroneous because:

> [T]he record evidence included that defendant implied to Dwight that he had a gun, said that Dwight was "on his last leg," and that he "would be right back." About ten minutes later, Dwight heard gunshots outside his house and a window breaking in his house. Several more gunshots were fired and Dwight was actually struck with two bullets. Dwight also testified that his relationship with defendant was "bad."

*Holden*, 2013 WL 1165220, at *5.

This court finds no merit in Holden's claim because a trial court's error "in applying the state sentencing guidelines raises an issue of state law only," *Garcia–Dorantes v. Warren,* 769 F. Supp. 2d 1092, 1112 (E.D. Mich. 2011) (Lawson, J.), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)). Holden, nevertheless, claims that the trial court violated his constitutional right to due process by sentencing him on inaccurate information.

A sentence violates due process of law if the trial court relied on extensively and materially false information that the defendant had no opportunity to correct through counsel. *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To obtain relief, Holden must

14

show that his sentence was "founded at least in part upon misinformation of constitutional magnitude." *United States v. Tucker*, 404 U.S. 443, 447 (1972).

Here, although there was no testimony at trial that Holden threatened to return to Dwight's home and "get him," Dwight testified at the preliminary examination that, when he looked out his front door and saw Holden, Holden informed him that he was coming back to "get" Dwight. (ECF No. 11-2, PageID.151.) Dwight also testified at the preliminary examination that on the day of the shooting, he and Holden did not begin fighting until after Holden said that he was going to "get" him. (*Id.* at 151–52.)

"Sentencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (citing *Pepper v. United States*, 562 U.S. 476, 487–489 (2011)). In Michigan, "[w]hen calculating the sentencing guidelines, a court may consider all record evidence, including . . . testimony presented at a preliminary examination." *People v. McChester*, 873 N.W.2d 646, 648 (Mich. Ct. App. 2015) (citing *People v. Johnson*, 826 N.W.2d 170, 172 (Mich. Ct. App. 2012)). Thus, the sentencing court could rely on Dwight's statements at the preliminary examination in formulating Holden's sentence.

Furthermore, there was trial testimony that after Holden fired a few shots at the front of Dwight's house, Dwight moved in front of a window and Holden fired his gun two more times, hitting Dwight in the shoulder. Based on this testimony, the trial court did not rely on materially false information or misinformation of constitutional magnitude when it concluded that Holden premeditated his offense. Holden is not entitled to relief on his sentencing claim.

## C.  Trial Counsel

Holden's next five claims allege ineffective assistance of trial and appellate counsel. The State argues that the five claims are barred by the habeas statute of limitations and that Holden's claims about trial counsel are also procedurally defaulted because he did not raise those claims on direct appeal.

The habeas statute of limitations is not jurisdictional, *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2006)). The court finds it more efficient to analyze Holden's claims on an alternative basis than to determine whether the claims are barred by the statute of limitations. Accordingly, the court excuses the alleged failure to comply with the statute of limitations and proceeds to address Holden's claims about trial counsel under the doctrine of procedural default.

### 1.  The Law of Procedural Default

As noted above, a procedural default is "a critical failure to comply with state procedural law." *Trest*, 522 U.S. at 89.  The Supreme Court has held that,

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this Circuit, therefore,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default." [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)]. To determine whether a

state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

The state procedural rule at issue here is Michigan Court 6.508(D)(3), which reads in relevant part as follows:

> (D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> . . . .
>
> > (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
> >
> > > (a) good cause for failure to raise such grounds on appeal or in the prior motion, and
> > >
> > > (b) actual prejudice from the alleged irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

## 2. Application

Petitioner violated Rule 6.508(D)(3) by not raising his claims about trial counsel in his appeal of right. He raised those claims for the first time in his post-appellate motion for relief from judgment. Petitioner's violation of Rule 6.508(D)(3) satisfies the first procedural-default factor.

The state trial court was the last state court to address Holden's claims about the adequacy of his trial counsel in a reasoned decision and it rejected these claims

because Holden did not show "good cause" under Rule 6.508(D)(3)(a) for failing to raise his claims on appeal or "actual prejudice" under Rule 6.508(D)(3)(b). This state court ruling constituted enforcement of Rule 6.508(D). Although the trial court also stated that Holden's claims about trial counsel lacked merit, the state court's alternative holding does not require this court to disregard the state court's procedural ruling. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). Thus, the trial court's ruling on Holden's trial counsel claims satisfies the second procedural-default factor.

The third procedural-default factor also is satisfied because Rule 6.508(D) is an adequate and independent ground on which state courts may rely to foreclose review of federal claims. *Howard*, 405 F.3d at 477. So, to prevail on his procedurally defaulted claims, Holden must show "cause" for his state procedural error and resulting prejudice.

Holden alleges in his seventh claim that his appellate attorney was ineffective for failing to raise his claims about trial counsel on direct appeal. Constitutionally ineffective assistance of counsel is cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). However, an appellate attorney is constitutionally ineffective only if (1) the attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability the defendant would have prevailed on appeal if his attorney had raised the issue. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

When assessing the second prong of the *Robbins* test, the court considers the strength of the claims that appellate counsel failed to raise. *Carter v. Parris*, 910 F.3d 835, 841 (6th Cir. 2018) (quoting *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)),

*cert. denied*, 139 S. Ct. 2703 (2019). "If there is no 'reasonable probability that inclusion of the issue would have changed the result of the appeal,' then habeas relief will not be granted." *Id.* (quoting *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)).

With these considerations in mind, the court will briefly address Holden's claims about his trial attorney, keeping in mind that a trial attorney is constitutionally ineffective only if counsel's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

### a. Counsel of Choice

In his third claim, Holden alleges that (1) the trial court deprived him of his right to counsel of choice and (2) his appointed attorney was ineffective for failing to (a) raise the counsel-of-choice issue in the trial court, (b) recuse himself after learning that Holden wanted to retain another attorney, and (c) request an adjournment so that Holden could retain another attorney.

The court has found no evidence in the record that Holden was unhappy with his appointed attorney, that he wanted to retain a different attorney, or that the trial court deprived him of his right to counsel of choice. The state trial court's docket shows that retained counsel filed an appearance in Holden's case on August 25, 2011, but an appointed attorney represented Holden at the preliminary examination on the same day and at all subsequent proceedings. Trial counsel was apparently appointed due to Holden's indigence, and "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Therefore, the trial court did not deprive Holden of a constitutional

19

right, and trial counsel was not ineffective for failing to raise the counsel-of-choice issue, recuse himself, or request an adjournment so that Holden could retain another attorney.

### b. Plea Bargaining

Holden alleges in his fourth claim that he was denied effective assistance of counsel during plea bargaining. According to Holden, trial counsel declined a favorable offer from the prosecution without informing Holden of the offer.

The record indicates that Holden was present during his arraignment in Wayne County Circuit Court when his attorney stated that the prosecution had not made any offers. The attorney also stated that Holden was not interested in pleading guilty, at least, not on the main charge. Holden did not contradict his attorney's remarks or say anything to the trial court. (ECF No. 11-3, PageID.180.)

At a subsequent motion hearing, which Holden attended, the prosecutor offered to dismiss two of the charges and the habitual offender notice if Holden pleaded guilty to assault with intent to murder and felony firearm. Defense counsel's response to the offer was, "I will go see if they have a better offer" and "We've gotten past this point." (ECF No. 11-4, PageID.193–94.) The trial court then stated that if there was no resolution, everyone should return to court on the date and time set for trial. (*Id.* at PageID.194.)

The next court proceeding was the trial, which commenced on December 8, 2011. Nothing further was said about any plea negotiations, but in a post-trial letter to Holden's appellate attorneys, trial counsel stated that Holden would have been allowed to plead guilty to assault with intent to do great bodily harm less than murder and felony-firearm. Although Holden contends that the letter is proof that his trial attorney did not

20

convey a plea offer to him, trial counsel also explained in the letter that Holden rejected the offer, contrary to counsel's advice and the advice of Holden's family. (ECF No. 21, PageID.972.) The record does not support Holden's claim that his trial attorney rejected a plea offer without first consulting Holden.

### c. Failure to Raise an Insanity Defense or Move for a Competency Examination

Holden's fifth claim alleges that trial counsel failed to (1) investigate evidence that he suffered from severe depression, (2) request a competency examination, and (3) consider the possibility of an insanity defense. In support of this claim, Holden alleges that he was involuntarily committed for mental health treatment before the incident in question and that trial counsel knew this but failed to investigate whether an insanity defense might be available.

### i. Insanity

An attorney's failure to explore the possibility of a not-guilty-by-reason-of-insanity defense can rise to the level of constitutionally defective counsel. *Daoud v. Davis*, 618 F.3d 525, 532 (6th Cir. 2010) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 771 (6th Cir. 2006)). Nevertheless, in Michigan, an insanity defense based on mental illness requires a defendant to prove that due to mental illness, he lacked a substantial capacity to appreciate the nature and quality of the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *People v. Jackson*, 627 N.W.2d 11, 14–15 (Mich. Ct. App. 2001). One factor that a court can consider when determining whether the defendant could conform his conduct to the requirements of the law is whether the defendant had the ability to control his behavior. *Id.* at 15.

Holden has not presented the court with any credible evidence that he was insane or even mentally ill at the time of the shooting. Even if he was suffering from mental illness at the time, the testimony at trial demonstrates that he could control his behavior. He had an argument with his half-brother Jerrell before the shooting incident and when Dwight confronted him, Holden said that he would be back. About 10 or 15 minutes later, Holden returned to Jerrell and Dwight's residence and fired his gun. He first shot at the door, and when Dwight moved to a window, Holden shot at the window. He then left the residence. Because Holden engaged in purposeful and goal-oriented behavior, an insanity defense would not have been viable, and trial counsel was not ineffective for failing to assert an insanity defense. *Chapman v. United States*, 74 Fed. App'x 590, 593 (6th Cir. 2003) ("Counsel is not required by the Constitution to raise frivolous defenses or arguments to avoid a charge of ineffective representation.").

### ii. Incompetence

The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*); *accord Drope v. Missouri*, 420 U.S. 162, 171 (1975) (stating that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"); *United States v. Abdulmutallab*, 739 F.3d 891, 899 (6th Cir. 2014) (stating that "[t]he test for competency to stand trial is whether

the defendant has (1) sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him") (footnote omitted).

Even if Holden was severely depressed and mentally ill, as he claims, it does not follow that he was incompetent to stand trial. *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996) (quoting *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir. 1977)). At trial, Holden engaged in a colloquy with the court when he waived his right to testify. He stated that he understood his right to testify and his right to remain silent and that the decision was his to make. (ECF No. 11-5, PageID.324–25.) The trial court then noted that Holden had been afforded an opportunity to discuss the advisability of testifying or not testifying with his attorney. When the trial court asked Holden if he had decided whether or not to testify, Holden said, "Can I have one second, your Honor?" (*Id.* at PageID.325.) The trial court responded, "Yeah, sure." (*Id.*)

The record is silent as to whether Holden actually consulted his attorney at that point. Even if he did not speak with his attorney, he informed the trial court shortly after requesting "one second" of time that he did not want to take the stand. (*Id.* ) The colloquy demonstrates that Holden understood the proceedings against him and that he had a sufficient ability to consult with his lawyer.

Additionally, at his sentencing two weeks later, Holden made an impassioned argument in his defense. He claimed that Dwight was "a wanted man" who was accusing him of something he did not do, that he (Holden) could barely use his right arm at the time of the shooting, and that it would have been impossible to see Dwight at the

23

time of the shooting because the blinds in the house were closed. (ECF No. 11-7, PageID.376–77.) When the trial court subsequently asked Holden how many years he thought he should be in prison, Holden responded, "If it was up to me your Honor, I don't know. I just know it wasn't me there and it's crazy for them to be accusing me of this." (*Id.* at PageID.377–78.)

The record indicates that Holden was competent during the court proceedings. Therefore, trial counsel was not ineffective for failing to request a competency hearing. *See Chapman*, 74 Fed. App'x at 593.

### d. Failure to Investigate

In his sixth claim, Holden asserts that trial counsel failed to investigate Dwight's criminal history and use of medications. Holden, however, has not shown that Dwight actually had a criminal history. Additionally, though Holden asserts that effective cross-examination of Dwight's use of medication and ability to observe the incident in question could have undermined Dwight's credibility, Holden suffered no prejudice from his attorney's failure to explore the issue on cross examination because the trial court *sua sponte* raised that issue when the court noticed that Dwight's speech seemed somewhat slow. (ECF No. 11-5, PageID.295–96.) In response to the court's inquiry, Dwight explained that he was taking about ten different medications due to kidney problems, high blood pressure, and a double fracture in his foot. (*Id.* at PageID.296.) Dwight also admitted to taking muscle relaxers to help him relax, and he stated that the medications sometimes affected his memory. (*Id.* at PageID.297.) But Dwight claimed to

remember the shooting, and he said that it was only "the time things" that he did not clearly recall. (*Id.*)

Given the trial court's thorough questioning of Dwight about his medications, defense counsel was not ineffective for failing to raise the same issue on cross-examination. Even if trial counsel's performance was deficient, the deficient performance did prejudice the defense because Dwight testified on re-direct examination by the prosecutor that his medications did not affect his vision or his ability to recognize Holden on the night of the crime. (*Id.* at PageID.303.)

### 3. Conclusion on Holden's "Cause" Argument; Prejudice; Miscarriage of Justice

For the reasons given above, Holden's claims about trial counsel lack merit. Therefore, appellate counsel did not act unreasonably in failing to discover and raise the claims on appeal, and there is no reasonable probability that Holden would have prevailed on appeal if his appellate attorney had raised the issues. It follows that appellate counsel was not ineffective or "cause" for Holden's procedural default. The court need not determine whether the alleged constitutional errors prejudiced Holden because he has failed to show cause for his failure to comply with state law. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

In the absence of "cause and prejudice," a habeas petitioner may pursue a procedurally defaulted claim if he can demonstrate that failure to consider his claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "A fundamental miscarriage of justice results from the conviction of one who is 'actually

25

innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Carrier*, 477 U.S. at 496). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Holden has not presented the court with new and reliable evidence of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the court's failure to address the merits of Holden's claims about trial counsel. His third, fourth, fifth, and sixth claims satisfy all four factors to justify procedural default and will be denied on that basis.

### D.  Appellate Counsel

In his seventh and final claim, Holden raises an independent claim about his appellate attorney. He alleges that appellate counsel failed to investigate his case and should have raised his claims about trial counsel on appeal.

No state court addressed this issue on the merits. Although the trial court implicitly rejected Holden's claim about appellate counsel in its order denying Holden's motion for relief from judgment, the focus of the order was Holden's claim that trial counsel was ineffective. The trial court's conclusion—that Holden's claims lacked merit—also referred to trial counsel. Thus, there was no clear adjudication on the merits of Holden's claim about appellate counsel, and "the deference due under AEDPA does not apply." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)).

Holden was represented by appointed counsel on appeal. He had no constitutional right to compel his appointed attorney to raise nonfrivolous arguments if the attorney, as a matter of professional judgment, decided not to raise the requested arguments. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) "In fact, the process of winnowing out weaker arguments on appeal is the hallmark of effective appellate advocacy." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quotation marks and citations omitted). To prevail on his claim for ineffective assistance of appellate counsel, Holden must demonstrate that (1) his appellate attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability he would have prevailed on appeal if his attorney had raised the issues. *Robbins*, 528 U.S. at 285 (citing *Strickland*, 466 U.S. at 687–91, 694).

Holden's underlying claims about trial counsel and the trial court's alleged failure to honor his right to counsel of choice lack merit for the reasons given in the discussion above. Therefore, Holden's claim that appellate counsel was ineffective for failing to raise these arguments also lacks merit. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). The court will deny his final claim.

## IV. CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal the court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal court dismisses

a petition on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and whether the district court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court concludes that reasonable jurists would not debate the correctness of the court's ruling. A certificate of appealability will be denied.

## V. CONCLUSION

The state appellate court's adjudication of Holden's first two claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts. Habeas claims three through six are procedurally defaulted, and Holden's seventh claim lacks merit. Accordingly,

IT IS ORDERED that the petition for writ of habeas corpus (ECF No. 1), as amended, is DENIED.

IT IS FURTHER ORDERED that Holden's informal requests in his pleadings for an evidentiary hearing and appointment of counsel are DENIED.

Finally, IT IS ORDERED that a Certificate of Appealability is DENIED.

<u>s/Robert H. Cleland</u>
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: November 4, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 4, 2019, by electronic and/or ordinary mail.

<u>s/Lisa Wagner</u>
Case Manager and Deputy Clerk
(810) 292-6522